UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-111 (JNE)

UNITED STATES OF AMERICA,

      Plaintiff,

    v.

SUZANNE GRIFFITHS,

      Defendant.

**GOVERNMENT'S SENTENCING POSITION**

"[D]o not fall for Suzanne Griffiths's antics, she has had years to perfect her act. She deserves to go to prison. All of us, her victims, deserve justice. That means seeing her behind bars." -Victim M.N. Suzanne Griffiths exploited her house-flipping businesses to steal $3,197,109.47 from casual investors. This case does not involve venture capitalists placing knowingly risky bets or private placement memoranda containing complex misrepresentations. Griffiths lied to real people, forged numerous documents to execute her scheme, and drained retirement accounts to fuel her lifestyle. The submitted victim impact statements best underscore the lasting impacts of Griffiths's greed. The United States respectfully recommends that the Court sentence Griffiths to 64 months' imprisonment followed by a 2-year term of supervised release.

## Griffiths's Criminal Conduct

In 2015, Suzanne and Gary Griffiths moved to Minnesota and became active in the local house-flipping market. (PSR ¶¶ 46, 57-59.) This started by attending national and local seminars and coaching programs. (PSR ¶ 10.) The couple found success and quickly gained local notoriety. (*Id.*) The seminars pointed to the couple as house-flipping "experts" and featured them as speakers at seminar events. (*Id.*)

This prominence provided a ready pool of potential investors in the couple's house-flipping businesses—Level 5 Properties, 45 North Investment Properties, and Our Town Properties. (*Id.*) Suzanne Griffiths ran the business while her husband focused on completing the actual home repairs. This resulted in Griffiths primarily soliciting investments, making representations about a given investment opportunity, and handling the financial aspects of the transactions. (PSR ¶¶ 11-12, 18.) Despite finding initial success, Griffiths's operation quickly devolved into an outright Ponzi scheme. (PSR ¶¶ 11-12.)

Griffiths went to great lengths to conceal her fraudulent actions. (PSR ¶¶ 11-13.) This included outright lies about the status of a given property, the position the investor would hold on the mortgage, and signing a personal guarantee that Griffiths had no intention of honoring. (*Id.*) Griffiths doubled down on her misrepresentations with specifics. She promised investors repayment on a specified date, with interest, and then responded to investor inquiries with additional platitudes. (*Id.*) She did this expressly to placate her investors and prolong the fraud scheme. (PSR ¶ 11.) It bears highlighting a few examples of Griffiths's misconduct to truly highlight the level of intent that animated her fraudulent scheme.

In November 2018, Griffiths solicited $100,000 from C.G. to finance repairs and renovations at a specific property. (PSR ¶ 12.) Griffiths made numerous assurances to C.G., including that C.G. would hold second position on the property, and provided C.G. with a signed promissory note, mortgage, and a personal guarantee. (*Id.*) Griffiths assured C.G. that all the necessary documents would be filed with the relevant county as additional protection on the investment. (*Id.*) But Griffiths missed the agreed-upon

payment window.   C.G. repeatedly contacted Griffiths and provided extensions premised on additional misrepresentations.  (*Id.*)  Griffiths bolstered these additional lies by reaffirming the filing of the mortgage documents to secure C.G.'s position.  (*Id.*) Eventually, Griffiths simply stopped responding to C.G. altogether.   C.G. only then discovered that Griffiths had not filed any of the relevant documents.   C.G. lost everything.  (PSR ¶ 20.)  According to C.G., "We have postponed [our] retirement plans [because of this loss] . . . She took advantage of our friendship and its tough to forgive her."  (*Id.*)

Similarly, also in November 2018—and almost simultaneous to C.G.'s investment—Griffiths received a $115,000 wire transfer from A.D.P.  (PSR ¶ 15.)  This investment also was ostensibly for improvements to a specified property. (*Id.*)  However, on the very day she received the funds, Griffiths promptly converted the money to a cashiers check to pay vendors on an unrelated project.  A.D.P. never would have invested the funds had it known Griffiths was going to misappropriate the funds to uses other than those promised.

In July 2020—over a year after C.G. and A.D.P.'s losses—Griffiths successfully solicited a $70,000 investment from T.J.  (PSR ¶ 13.)  She parlayed this investment into an additional solicitation in October 2020.  (*Id.*)  Griffiths provided T.J. information about the second investment opportunity on title company letterhead to demonstrate the investment's potential.  (*Id.*)  But T.J. contacted the title company to verify the information.   (*Id.*)   T.J. learned that Griffiths had altered the document to omit numerous encumbrances on the property.  T.J. lost his initial $70,000 investment and, absent his diligence, would have lost even more on the second.  (*Id.*)

These are representative examples of experiences shared by all 18 identified victims. (PSR ¶ 12.) The victim impact statements contained in the PSR—and those that will be shared at the sentencing hearing—are far more illuminating of Griffiths's actions than a detailed recitation of the facts. (PSR ¶ 20.) Almost without exception, *each* victim related (a) ornate lies told by Griffiths to separate victims from their money, (b) specific acts of forgery and falsified documents intended to lull victims into complacency, (c) a total lack of accountability when the victims confronted Griffiths, and (d) Griffiths disappearing entirely when the lies stopped working. (*Id.*) Numerous victims attempted to achieve accountability through civil judgments. (*Id.*) But the victims often ended up with default judgments that proved almost impossible to enforce. (*Id.*)

On April 30, 2021, Griffiths filed for Chapter 7 bankruptcy. (PSR ¶¶ 20, 57-59, 63, 66.) This filing aggravated the investors who had obtained personal guarantees from Griffiths on their investments. (*Id.* ¶ 20.) Although some victims confronted Griffiths during the proceeding, Griffiths continued to evade accountability. (*Id.*) Notably, many of Griffiths's averments in the bankruptcy petition involved known victims of her criminal offense. (*Id.* ¶¶ 57-58.) Griffiths voluntarily dismissed the petition prior to criminal charging.

In sum, between 2018 and December 2020, Griffiths fraudulently obtained $3,197,109.47 in investor funds. (*Id.* ¶ 16.) The restitution amount is lowered to $1,661,407.50 because some victims were able to recover their assets through the foreclosure process. Although Griffiths used some of the fraud proceeds to prolong the fraud—a hallmark of Ponzi schemes—she also exploited investor funds to finance

4

personal vacations, purchase vehicles, and pay other personal expenses.  (*Id.* ¶ 17.)  On

June 6, 2022, the government charged Griffiths by criminal information with wire fraud

and money laundering.  (Dkt. 1.)  On June 16, 2022, Griffiths pleaded guilty pursuant

to a plea agreement.  (Dkts. 6-8.)

### The Presentence Report

The PSR correctly calculated a total offense level of 25 and a criminal history

category of I.  (PSR ¶ 73.)  This calculation accounts for the intended loss amount, the

number of victims, Griffiths's use of sophisticated means, and that Griffiths engaged in

money laundering.  (*Id.* ¶ 27.)  This results in an applicable Guidelines range of 57-71

months.

The government maintains a technical objection to the PSR's calculation of actual

loss and corresponding restitution.  The parties' agreed in the plea agreement to an

actual loss and restitution figure of $1,661,407.50.  (Dkt. 8 ¶ 12.)  On August 17, 2022,

the government filed its response to the preliminary PSR and noted it had received some

additional information that may impact the restitution figure.  (Dkt. 18.)  Importantly,

however, the government did not provide USPPS any substantiating documentation

regarding a potential change in the restitution amount.  Moreover, the government

clearly informed USPPS that it would only request a revision if the parties agreed to

one.  (PSR ¶ 4.)  The parties have had numerous productive discussions regarding this

issue and the continuing fluidity of housing assets.  On November 23, 2022, the parties

had a final consultation and agreed that the actual loss and restitution figure should

remain $1,661,407.50.  *See United States v. Beston*, 43 F.4th 867 (8th Cir. 2022)

(concluding government breached plea agreement by providing United States Probation

with evidence to increase restitution figure and then advocating for increased restitution amount at sentencing). This agreement will not foreclose civil remedies for victims who experience additional prospective losses.

Accordingly, the government requests—it believes jointly—that the PSR be revised to reflect that $1,661,407.50 is the correct amount for actual loss and restitution. *See* PSR ¶¶ 4, 16-17, 19, and 86.

## The Appropriate Sentence

Griffiths's fraud is animated by greed. She bypassed numerous opportunities to stop soliciting investments. Instead, she lied to investors, forged documents, and hoped to avoid responsibility. Despite her efforts to suggest otherwise, this is *not* a case of bad business or uncontrollable circumstance. The government again defers to those who know her criminal conduct best:

> Any remorse Ms. Griffiths shows for her crimes is just pretense. As one of her victims, I have seen that her words do not match her actions. And if she were truly remorseful, her actions would have changed. Yet she perpetuated her fraud for years. She is an accomplished actor and con artist . . . Being caught is the only thing for which Ms. Griffiths is truly remorseful.

(PSR ¶ 20; Victim M.R.) The government respectfully submits that a 64-month sentence is sufficient, but not greater than necessary, to address the severity of Griffiths's conduct, account for the lack of mitigating factors other than her acceptance of responsibility, and to effectuate the broader goals of specific and general deterrence.

A.    Nature & Seriousness of the Offense

The criminal conduct in this case is remarkably brazen. Over an 18-month period, Griffiths stole $3,197,109.47 from 18 different investors. She accomplished this

by lying, repeatedly, to each of them. The impact of her crimes cannot be understated. The victim impact statements speak for themselves, and the pain expressed extends far beyond the financial losses.

The intentionality with which Griffiths acted is particularly aggravating. It is common sense that real estate transactions are inherently complex. This required Griffiths to master the details of mortgage positions, liens, subcontracting, construction draws, and deeds. She apparently did so. This allowed Griffiths to fabricate invoices, falsify lien releases, forge notary stamps, and otherwise generate bogus documentation to lure people into her scheme or hold them at bay. And, as complicated as the real estate industry might be, it is equally uncomplicated that forgery is objectively wrong. The act of forgery is a detailed and premeditated act. There is no reason to forge documents for legitimate endeavors. Griffiths went to great lengths to separate these investors from their money. The manner with which she did so makes it crystal clear that she knew full well it was wrong.

The aggravating circumstances of Griffiths's criminal conduct—and there are many—are muted only by her acceptance of responsibility. This is the sole reason the government is not seeking an upward variance. However, Griffiths's acceptance remains underwhelming. Griffiths casts herself as a victim of circumstance who was "struggling to make things right" and "get out from under the debt." But actions speak louder than words. Griffiths never ceased operations or asked for help. Instead, she roped in new investors like T.J., while ghosting the problematic ones seeking answers. This continued right up until she pulled the plug on her attempted bankruptcy filing.

Griffiths's victims speak with one incredibly skeptical voice regarding Griffiths's apparent contrition. (PSR ¶ 20.)

The government respectfully submits that the requested 64-month sentence—in the middle of the applicable Guidelines range—effectively balances these realities in a way that reflects the seriousness of this offense, promotes respect for the law, and provides just punishment.

B.      History & Characteristics of the Defendant

Unfortunately, Griffiths's history and characteristics make this situation even more confounding. (PSR ¶¶ 43-53.) The daughter of teachers, Griffiths was raised by loving parents and benefitted from a "positive and healthy upbringing, void of abuse or neglect." (*Id.* ¶ 44.) The Griffiths married in 2000 and, until the current offense, had prospered in the construction field. (PSR ¶¶ 45, 57-62.) These realities helped Griffiths cultivate her own loving and supportive family, which remain firmly in her corner. (PSR ¶¶ 71-72.) Griffiths is reportedly in good physical and emotional health without any history of substance abuse.

The government highlights these realities not to punish Griffiths for capitalizing on good fortune. Instead, Griffiths's history and characteristics aggravate the senseless nature of her criminal conduct.

C.      Need for General Deterrence

Fraud defendants "act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015). Accordingly, such defendants are prime candidates for a sentence tailored toward deterrence. *Id.*; *see also United States v.*

*Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (concluding that fraud defendants are ripe for deterrence because "economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity."). This case requires a sentence tailored at achieving both specific and general deterrence.

Griffiths's acceptance of responsibility not only casts her as a victim of circumstance, but it also relates how horrible this experience has been for Griffiths and her family. (PSR ¶ 22.) The government expects Griffiths will advocate for extraordinary leniency given her circumstances and the collateral consequences of this prosecution. But collateral consequences are the natural outcome of criminal behavior and not a component of criminal sentencing. *See, e.g.*, *United States v. Musgrave*, 761 F.3d 602, 607 (6th Cir. 2014) (concluding that consideration of natural collateral consequences are "impermissible considerations" in criminal sentencing). The government also again underscores the victim impact statements that uniformly urge abject caution regarding Griffiths's ability to evade accountability and achieve her desired ends. It is important that the imposed sentence shakes Griffiths of these notions.

The need here for general deterrence is fully exemplified by the perception of some in Griffiths's own family that this prosecution is "ridiculous." (PSR ¶ 47.) There remains an apparent narrative that this entire thing is a misunderstanding or the result of some impartial government action. (*Id.*) These narratives create a self-fulfilling prophecy in which anything other than leniency confirms that errant belief. The imposed sentence must send a clear signal to others tempted to weigh the pros and cons of complex fraud. Otherwise, particularly given the length of time required to discover

such misconduct, others may well elect the risk and hope for a similar opportunity to explain away their misdeeds.   This is separate and apart from the message extraordinary leniency would send to the victims of Griffiths's crimes.

## Conclusion

For these reasons, the government respectfully recommends a sentence of 64-months' imprisonment, followed by a 2-year term of supervised release, and a restitution order of $1,661,407.50.   Such a sentence fully comports with the United States Sentencing Guidelines and the goals of Title 18, United States Code, Section 3553(a).

Dated: November 23, 2022                    Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

*/s/ Jordan L. Sing*

JORDAN L. SING
Assistant United States Attorney